UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
FEDERAL INSURANCE COMPANY,            :
                                      :
            Plaintiff,                :
                                      :
      -against                        :
                                      :
TURNER CONSTRUCTION COMPANY,          :
                                      :     No. 07 Civ. 11095 (JFK)
            Defendant,                :     **Opinion and Order**
                                      :
      -and-                           :
                                      :
NEW YORK CITY ECONOMIC DEVELOPMENT    :
CORPORATION, as Assignee of Turner    :
Construction Company,                 :
                                      :
            Intervenor-Defendant.     :
----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3-29-11___

APPEARANCES:

      For Plaintiff:
            Scott D. St. Marie, Esq.
            Theodore L. Hecht, Esq.
            Cynthia A. Murray, Esq.
            SCHNADER HARRISON SEGAL & LEWIS LLP

      For Defendant:
            Howard M. Rosen, Esq.
            David A. Fultz, Esq.
            PECKAR & ABRAMSON, P.C.

      For Intervenor-Defendant:
            New York City Law Department, Office of the
            Corporation Counsel
                  Of Counsel:  Todd A. Krichmar, Esq.
                               Steven C. Brown, Esq.

**JOHN F. KEENAN, United States District Judge:**

      Before the Court is Plaintiff Federal Insurance Company's

("Federal" or "Plaintiff") motion for partial summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure and

Intervenor-Defendant New York City Economic Development Corporation's ("EDC") cross motion for summary judgment and leave to amend its Answer to include a direct cause of action against Federal.  For the reasons that follow, Federal's motion for summary judgment is granted.  EDC's motion to amend is denied as moot.

## I.      Background

### A.   The Contract

The following facts are undisputed unless otherwise noted. EDC is a non-profit company that acts as a development consultant for the City of New York.  In a contract dated August 27, 2004, EDC engaged Defendant Turner Construction Company ("Turner"), a New York corporation, to provide construction management services for a modernization project involving the New York Cruise Terminal.  (Decl. of Cynthia Murray ("Murray Decl."), Ex. 1).  With EDC's approval, on April 5, 2006, Turner entered into a subcontract with non-party Pile Foundation Construction Co., Inc. ("Pile") whereby Pile agreed to perform marine structures work on the Cruise Terminal, specifically widening Pier 88 and rehabilitating its supporting piles, for a fixed fee of $21,044,180.[1]  (Murray Decl., Ex. 2).  In connection with the subcontract, Pile obtained a payment bond and a

---

[1] The subcontract price was later increased to $25,284,180. (Murray Decl., Ex. 6).

performance bond (the "Performance Bond") in the amount of
$21,044,180 from Federal, an Indiana corporation located in New
Jersey.  Pursuant to the terms of the Performance Bond, if Pile
defaulted on its obligations under the subcontract, Federal
would either complete the subcontract work or pay Turner for the
cost of completion.  The Performance Bond names Pile as the
principal, Federal as the surety, and Turner as the obligee.
(Decl. of Vincent C. Miseo ("Miseo Decl."), Ex. 1).

        The relationship between Turner and Pile became contentious
fairly quickly, as Turner expressed dissatisfaction with Pile's
performance.  Pursuant to Article XI of the subcontract, upon
three days written notice, Turner had the right to terminate
Pile if Pile was found to be in default, for example, by failing
to supply materials or meet deadlines.  (Murray Decl., Ex. 2 at
EDC 3346-47).  On January 4, 2007, Turner issued a notice of
default informing Pile that its failure to cure various problems
would result in termination of the contract.  (Murray Decl., Ex.
7).  The parties entered into negotiations to resolve the
problems giving rise to Pile's default, and Federal retained
Lovett Silverman Construction Consultants as a construction
consultant to assist Pile in preparing a new work schedule.
(Decl. of Dmitri V. Konon ("Konon Decl.") ¶ 53; Ex. K).
Ultimately, Turner and Pile executed a memorandum of
understanding ("MOU") dated April 3, 2007 confirming that Turner

would withdraw the January 4, 2007 default notice and extend the deadline for Pile's substantial completion of work from May 25, 2007 to August 1, 2007.  Federal consented to the April 3, 2007 MOU by its signature.  (Murray Decl., Ex. 10).

### B.   Payment Dispute

Soon after execution of the April MOU, a separate issue arose with respect to payment under the subcontract.  This dispute is best understood in the context of EDC's practices for funding municipal projects and approving project contracts.  The various witnesses offer confused accounts of the process, but Dmitri Konon of EDC, who served as the Project Manager for the Cruise Terminal project, the person in the best position to testify as to how EDC conducts its business, explained at his deposition as follows.

Vendors wishing to do business with the City of New York must submit a sworn Vendor Information Exchange System ("VENDEX") questionnaire to the Mayor's Office of Contract Services disclosing certain information the City uses to ensure that it selects "responsible" vendors.  VENDEX questionnaires are valid for three years.  The Cruise Terminal project was funded by the City of New York.  In order to get money from the City for contract work, EDC generally registered the contract in question with the Comptroller's office.  (Murray Reply Decl., Ex. 2 at 28).  The process for registering a Cruise Terminal

4

contract with the Comptroller was straightforward:  Turner would
submit an approval letter to EDC summarizing the terms of a
proposed subcontract, and Mr. Konon would decide whether to
accept or reject the subcontract.  At this point, the proposed
subcontractor's VENDEX disclosures would help EDC to determine
whether it was a responsible vendor that should be approved for
City-funded work.  After deciding to accept a subcontract, EDC
would submit it to the Comptroller.[2]  Although it is not clear
that the rules governing public procurement contracts apply to
EDC, which is not a City agency, this description is consistent
with the requirements for City contracts found in the Rules of
the City of New York[3] and the New York City Charter,[4] which

---

[2] In contradiction to his deposition testimony, Mr. Konon's
declaration in support of EDC's motion for summary judgment
states that a VENDEX package must be submitted to the
Comptroller for approval, but EDC expected that the Comptroller
would reject Pile's VENDEX package and provide no further
funding for Pile's work.  (Konon Decl. ¶¶ 63, 106).  The
Vendor's Guide to VENDEX states unequivocally that "[t]here is
no such thing as a VENDEX approval.  Once the City has accepted
VENDEX forms for a submitting vendor and its principal owners or
officers and has inputted the information into the VENDEX
system, the agency performs contract-specific responsibility
determinations."  (Murray Decl., Ex. 1-E-11).  It is the
subcontract that is submitted to the Comptroller.

[3] The Rules of the City of New York specify that:
    Prior to making its determination of vendor
    responsibility, the agency shall request the
    Department of Investigation to conduct a Vendor Name
    Check on the proposed vendor, which shall consist of a
    review of the names on the [VENDEX] Questionnaire and
    other information to ascertain whether the business or
    its affiliated individuals are or have, during a
    relevant period of time, been the subject of an

provide that VENDEX forms should be reviewed and approved
contracts should be filed with the Comptroller prior to
beginning work.  Although the contract between EDC and Turner
was duly registered, (id. at 12), EDC did not consistently
register subcontracts for the project.  (Id. at 36).

Pile submitted a bid to Turner for the marine structures
work, and Turner forwarded an approval letter to EDC.  (Murray
Decl., Ex. 3).  At the time of approval in 2006, Pile had a
valid VENDEX form on file with the Mayor's Office.  (Konon
Decl., Ex. L).  There is no evidence indicating whether EDC
reviewed Pile's VENDEX prior to approving the subcontract, but

---

> investigation by the Department. . . .  If the
> Department of Investigation ascertains that there has
> been such an investigation, it shall provide a copy of
> any final report or statement of findings to the
> Agency Head for use in making the determination of
> responsibility.

Rules of the City of New York § 2-08(f)(1).

[4] The City Charter provides that:

> No contract or agreement executed pursuant to this
> charter or other law shall be implemented until (1) a
> copy has been filed with the comptroller and (2)
> either the comptroller has registered it or thirty
> days have elapsed from the date of filing, whichever
> is sooner, unless an objection has been filed pursuant
> to subdivision c of this section, or the comptroller
> has grounds for not registering the contract under
> subdivision b of this section.

N.Y. City Charter, tit. 13, § 328.  The Comptroller may object
to registration of a contract "if in the comptroller's judgment
there is sufficient reason to believe that there is possible
corruption in the letting of the contract or that the proposed
contractor is involved in corrupt activity."  Id.  The
Comptroller has grounds not to register a contract if
insufficient funds have been appropriated to cover its cost.
Id.

that approval is tantamount to a finding that EDC deemed Pile to be a responsible vendor.  EDC's next step logically would be to submit the subcontract to the Comptroller for registration in order to fund Pile's $21 million of marine structures work. However, EDC had received from the City a so-called "blanket registration" of $25 million with which to start construction work on the Cruise Terminal.  (Murray Reply Decl., Ex. 2 at 24-25).  It is not clear whether this occurred inadvertently, but instead of registering the subcontract, EDC paid Pile out of the $25 million blanket registration funds.  (Id. at 28-29).  EDC does not dispute that at the time it approved Turner's subcontract with Pile, it did not notify Turner, Pile, or Federal that payment of the full contract price was contingent on the contract being registered with the New York City Comptroller.  (Pl. Local R. 56.1 Statement ¶ 9; Def. Local R. 56.1 Statement ¶ 9).

Pile's work progressed for more than one year, during which it earned and was paid $13,858,830.  (Pl. Local R. 56.1 Statement ¶ 15; Def. Local R. 56.1 Statement ¶ 15).  In approximately May or June of 2007, EDC experienced a budget crunch.  Mr. Konon testified:

> At that point we questioned why there was so little
> funding remaining in the contract when we had this $25
> million blanket registration, we had a Pile Foundation
> contract of $21 million and we had other
> subcontractors and other people working and at that

7

period of time is when we discovered that the Pile
Foundation's contract hadn't been registered but had
been getting paid through the $25 million blanket
registration but that money had now been exhausted.
And at that point we were told [by EDC's contracts or
budget group] that we needed to register the Pile
Foundation's contract to keep the money flowing on the
project.

(Murray Reply Decl., Ex. 2 at 29-30).

Meanwhile, during a compliance check, EDC realized that

Pile's VENDEX form had expired.  (Konon Decl. ¶ 67; Ex. M).  At

EDC's request, Pile submitted an updated VENDEX form dated May

14, 2007.  In that form, Pile certified that no principal owner,

officer, managerial employee, or the company itself had been

investigated by any government agency in the previous five

years.  (Murray Decl., Ex. 14 at 5).  EDC reviewed the VENDEX in

conjunction with the New York City Department of Investigation

("DOI").  DOI sought further information about Pile's

involvement in any investigations; from Pile's response, EDC

learned that Pile and its principal, Anthony Rivara, had been

subpoenaed in 2006 in connection with an investigation in the

Eastern District of Virginia regarding corrupt practices in the

marine supply industry.  (Murray Decl., Ex. 15).

Thus, EDC was confronted with two problems:  first, the

discovery that Pile's updated VENDEX form was inaccurate caused

it to reevaluate its previous, albeit implicit, determination

that Pile was a responsible subcontractor; and second, it felt

8

it could not belatedly register a subcontract entered into with a potentially irresponsible vendor, meaning that it could not secure funds from the City to pay that subcontractor. Nevertheless, EDC insisted that the potentially irresponsible vendor continue work on the Cruise Terminal project.  The parties attempted to solve this impasse by executing an August 22, 2007 MOU modifying the subcontract's terms.

> The August MOU first recounts that:
>
> While you [Anthony Rivara] have expressed your intent to take measures to resolve [issues raised by Pile's disclosure of the Eastern District of Virginia investigation], you have also been informed that, as a result of these issues, the New York City Comptroller ("the Comptroller") may not register Pile's subcontract with Turner, dated April 5, 2006, . . . and therefore, until such time as the Subcontract is registered by the Comptroller, the City will not fund EDC for the work performed by Pile at the [New York Cruise Terminal] Project.  As a result, EDC will not have funds to make any payment to Turner on account of the Subcontract.  Nevertheless, you represented that Pile will continue to perform all work under the Subcontract and achieve completion of the work in accordance with certain milestones set forth below, notwithstanding the lack of any payment from Turner unless and until the Subcontract has been registered by the Comptroller.

In light of these representations, the August MOU provides:

> Pile agrees to complete all work associated with the construction of the north and south aprons on Pier 88 as required by the Subcontract.
>
> Pile acknowledges that it will not receive any further payments under the Subcontract until such time as the Subcontract has been registered by the Comptroller, which action is contingent upon Pile (1) resolving to the satisfaction of the

Comptroller any issues as may be deemed by the
Comptroller to be an impediment to registration,
and (2) resolving any issues as be may [sic]
identified by DOI and EDC as an impediment to
Pile being declared a responsible contractor in
connection with the Subcontract.  The parties
recognize that in order for Pile to resolve any
question regarding registration by the
Comptroller and to resolve any question about
Pile's responsibility in connection with the
Subcontract, Pile will require the cooperation of
EDC.  If, because of Pile's status, the
Subcontract cannot be registered and approved by
the City Comptroller within ten years from the
date hereof then Pile agrees it will not receive
any further payment beyond the $13,858,830 paid
to date, and waives and releases any claim
against Turner and/or EDC for such payments.

The August MOU additionally provides that:  (1) certain

deck and pile work on the north and south sides of Pier 88 will

be complete by September 14, 2007; (2) in-water work will be

complete by October 31, 2007; (3) all work on the north and

south sides of Pier 88 will be substantially completed by

December 1, 2007; (4) Turner may terminate the contract if Pile

fails to achieve any of these three milestones; (5) Turner and

EDC withdraw all back charges and claims prior to August 22,

2007; (6) the April 3, 2007 MOU is null and void; and (7) all

communications concerning any contractual non-conformance by

Pile will come from EDC, not Turner.  (Murray Decl., Ex. 13).

Although Turner's initial draft of the August MOU included a

copy to Federal, Pile requested that Federal not be involved.

(Konon Decl., Exs. V, W).  Thus, unlike the April MOU, Federal

was not a party to the August MOU and was not asked to sign or consent to it.  EDC contends that Federal became aware of the August MOU no later than August 27, 2007, while Federal maintains that it first saw the document in September 2007.  It is undisputed that EDC never submitted Pile's subcontract to the Comptroller for registration.

### C.   Pile's Default

The dispute between Turner and Pile reached a boiling point in September 2007.  On September 14, 2007, Turner sent Pile a three-day notice stating that Pile was in default on the basis of its failure to complete deck and pile work on the south side of Pier 88 by September 14, 2007 as provided in the August MOU. Turner also sent a notice of default to Federal; Turner attached copies of the default letter addressed to Pile as well as the August MOU.  (Miseo Decl., Ex. 3).  On September 18, 2007, Turner sent Pile another letter in furtherance of the notice of default.  The September 18th letter acknowledged that EDC had previously agreed to a one week extension of the September 14, 2007 milestone with respect to work on the south side of Pier 88, but refused to alter any other milestones in the August MOU. It additionally demanded that Pile obtain a letter from the U.S. Attorney for the Eastern District of Virginia stating that Pile was no longer the subject of a criminal investigation and submit a new and complete VENDEX form by September 21, 2007.  Turner

11

advised Pile that it "intends to terminate the employment of
Pile under the Subcontract effective on September 21, 2007 if
any of the above items are not satisfied and Pile's defaults
cured in accordance with the Subcontract as modified by the
Letter Agreement dated August 22, 2007 and the terms set forth
in this letter." (Miseo Decl., Ex. 4).  Finally, on September
26, 2007, Turner sent Pile a letter terminating Pile's
employment "in light of Pile's failures to cure its defaults."
(Miseo Decl., Ex. 5).

     With EDC's approval, Turner employed Phoenix Marine Company
to complete the subcontract and demanded that Federal pay those
completion costs in accordance with the Performance Bond.
(Konon Decl. ¶ 130; Miseo Decl., Ex. 6).  Federal refused to pay
Turner damages under the bond, arguing that the August 2007 MOU
constituted a material alteration of the subcontract and that
Turner wrongfully terminated Pile.  (Miseo Decl., Ex. 6).
Meanwhile, EDC reimbursed Turner for the completion costs
associated with hiring Phoenix Marine.  (Murray Decl., Ex. 4 at
71-75).  Federal filed the instant action on December 7, 2007
seeking a declaration that it has no further obligation to
Turner under the Performance Bond.  After interposing
counterclaims, Turner assigned its causes of action under the
Performance Bond to EDC.  Federal consented to EDC's motion to
intervene in this case and stipulated to the filing of its

Answer and counterclaims for a declaration of Federal's obligations under the Performance Bond and to recover costs of completion.

## II.    Discussion

Summary judgment is appropriate when the pleadings and admissible evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A genuine dispute exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Where jurisdiction is premised on diversity of citizenship, the district court applies the choice of law rules of the forum state, here New York.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Gilbert v. Seton Hall Univ., 332 F.3d 105, 109 (2d Cir. 2003).  New York law applies a "center of gravity"

13

or "grouping of contacts" analysis to determine the substantive law governing contract disputes.  GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc., 449 F.3d 377, 383 (2d Cir. 2006) (citing In re Allstate Ins. Co. (Stolarz), 613 N.E.2d 936, 939 (N.Y. 1993)).  As both Turner and EDC are New York corporations, the subject matter of the subcontract is the New York Cruise Terminal, and the subcontract's performance took place in New York, the Court will apply New York contract law.  The parties themselves cite to New York law, indicating their agreement with this conclusion.

### A.   Release From Liability Under the Performance Bond

Federal and EDC each seek a declaratory judgment determining Federal's obligation, if any, under the Performance Bond.  "In a case of actual controversy within its jurisdiction," a federal court may issue a judgment declaring "the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201.  A declaratory judgment action is ripe for adjudication where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 388 (2d Cir. 2005) (citing Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941)).  In considering whether to issue a declaratory

judgment, the district court must ask: "(1) whether the judgment
will serve a useful purpose in clarifying or settling the legal
issues involved; and (2) whether a judgment would finalize the
controversy and offer relief from uncertainty." Id. at 389.
The Court finds that issuing a declaratory judgment as to
Federal's liability under the Performance Bond is appropriate in
this case as it will resolve the main point of contention
between the parties.

### 1.   Material Modification

Federal argues that the August MOU materially changed the
bonded contract such that it is released from liability under
the Performance Bond.  The surety bond is construed in
conjunction with the underlying contract, which, in this case,
was incorporated by reference into the bond.  "The
interpretation of a contract of suretyship is governed by the
standards which govern the interpretation of contracts in
general." Gen. Phoenix Corp. v. Cabot, 300 N.Y. 87, 92, 89
N.E.2d 238 (N.Y. 1949).  "[C]ontracts of sureties are to be
construed like other contracts so as to give effect to the
intention of the parties.  In ascertaining that intention, we
are to read the language used by the parties in light of the
circumstances surrounding the execution of the instrument."
People v. Backus, 117 N.Y. 196, 201, 22 N.E. 759 (N.Y. 1889).
In interpreting the surety contract, the court must bear in mind

that a "compensated, corporate surety . . . is not a favorite of the law and its contract of suretyship will be construed in a manner most favorable to [the] claimant." U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 74 (2d Cir. 2004) (internal quotation omitted). Nevertheless, after "the meaning of the language used has been thus ascertained, the responsibility of the surety is not to be extended or enlarged by implication or construction, and is strictissimi juris." Backus, 117 N.Y. at 201; see United States v. Suffolk Constr. Co., Inc., No. 95 Civ. 9363, 1998 WL 241628, at *3 (S.D.N.Y. May 12, 1998) ("The limitation of liability imposed by the principle of strictissimi juris is not upon the interpretation but in the application of the contract after interpretation."); Village of Argyle v. Plunkett, 226 N.Y. 306, 310, 124 N.E. 1 (N.Y. 1919) ("[A] surety is not entitled to any particular tenderness in the interpretation of the language of a contract which it has executed.  Its contract is to be construed fairly in accordance with the general principles applicable to the construction of contracts.  When, however, the contract has thus been interpreted the surety is entitled to a strict limitation of its obligations in accordance with such interpretation.").

"Under general contract rules, an obligation may not be altered without the consent of the party who assumed the obligation.  Suretyship is a contractual relation and thus the

16

rule is stated that the creditor and the principal debtor may not alter the surety's undertaking to cover a different obligation without the surety's consent.  If they do so the surety is discharged because the parties have substituted a new contract, to which it never agreed, for the original." Bier Pension Plan Trust v. Estate of Schneierson, 545 N.E.2d 1212, 1214 (N.Y. 1989).  "[W]here a surety has not consented to a change in the bonded contract, to discharge a compensated surety from its bond, the change must increase the surety's risk, be material or substantial, or be prejudicial to the surety." Braspetro, 369 F.3d at 61; see Midland Steel Warehouse Corp. v. Godinger Silver Art Ltd., 714 N.Y.S.2d 466, 468 (N.Y. App. Div. 2000) (the principle of contractual alteration releasing surety applies "to any alteration of the contract to which his guarantee applies which indirectly operates to modify the extent of the guarantee").  "Under construction contracts specifically making allowances for alterations during the progress of the work, changes not fairly within the contemplation of the parties at the time the original contract was made, constituting a material departure from the original undertaking, will therefore release a nonconsenting surety from obligations under its bond." In re Liquidation of Union Indem. Ins. Co. of N.Y., 632 N.Y.S.2d 788, 789 (N.Y. App. Div. 1995).

The question before the Court is whether the August MOU's requirement that Pile work without payment unless or until EDC registered the subcontract with the Comptroller materially altered the bonded subcontract.  First, the Court must determine whether the Performance Bond and integrated subcontract originally included a registration requirement, construing any ambiguity against Federal.  In this case, there is no ambiguity – there is no proviso in the Turner/Pile subcontract requiring its registration with the Comptroller.  The onus of registration was on EDC – which is not a party to the subcontract – in order to fund project work.  It is undisputed that, at the time it approved the subcontract, EDC never told Turner, Pile, or Federal about the necessity of registration with the Comptroller.  EDC itself overlooked any registration requirement, allowing Pile's work to progress for over a year without submitting the subcontract to the Comptroller.  Neither the contract terms nor the course of performance give any indication that Federal, Turner, or Pile contemplated registration with the Comptroller as a precondition to payment under the subcontract.

EDC points to Section 4.2.6 of the contract between EDC and Turner, which is incorporated by reference into the Turner/Pile subcontract, as evidence that the pre-August MOU subcontract obligated Pile to clear its VENDEX status.  If that were the

case, EDC argues, the August MOU would not be a contract modification at all.  Section 4.2.6 specifies that Turner "will furnish each such Subcontractor whose Subcontract amount totals $100,000 or more with the Mayor's Office of Contracts Investigations Forms, the process for which is generally described in Exhibit E, attached hereto and made a part hereof." EDC was to provide the forms to Turner, and Turner agreed to ensure that its subcontractors completed the forms "in no event later than the commencement of the Services performed by such Subcontractor pursuant to its subcontract."  (Murray Decl., Ex. 1 ¶ 4.2.6).  Exhibit E is a copy of the Vendor's Guide to VENDEX, a booklet put out by the Mayor's Office with instructions about how to fill out a VENDEX form.

The Court agrees that Pile was contractually, and legally, obligated to file complete and accurate VENDEX forms with the Mayor's Office every three years.  However, EDC conflates VENDEX submission to the Mayor's Office and contract registration by the Comptroller.  The two processes are complementary but distinct.  A VENDEX submission provides EDC with the information it needs to determine whether a subcontractor is responsible. After making that determination, EDC sends the subcontract to the Comptroller.  Although review of a truthful VENDEX form is an important precursor to EDC's submission of the subcontract for registration, nothing in Section 4.2.6 of the EDC/Turner

19

contract, any provision of the Turner/Pile subcontract, or the August MOU requires EDC in turn to submit the subcontract to the Comptroller.

EDC seems to assume that submission to the Comptroller would naturally occur as soon as Pile cleared up its VENDEX disclosures, but there is no evidence of any obligation on EDC's part to do so. Generally, EDC's need for City funds would encourage it to follow through with registration, but that situation did not occur here due to the blanket registration, and in fact, EDC never submitted the subcontract to the Comptroller. To the extent City regulations required EDC to send the subcontract to the Comptroller, it neglected that legal obligation. In other words, the original Turner/Pile subcontract obligated Pile to file VENDEX forms, but did not impose a corresponding obligation on EDC to register or attempt to register the subcontract with the Comptroller once Pile provided the requested information. By adding Comptroller registration as a precondition to payment, the August MOU added a new contractual provision that was not contained in the original subcontract.

Next, the Court must determine whether the August MOU constituted a material alteration of the subcontract. While registration seems a relatively routine act, the August MOU gave a third party to the subcontract, EDC, unfettered discretion to

20

decide whether to submit the subcontract to the Comptroller, all
the while requiring Pile to continue work on Pier 88 without
pay.  See Murray Decl., Ex. 13 ("The parties recognize that in
order for Pile to resolve any question regarding registration by
the Comptroller and to resolve any question about Pile's
responsibility in connection with the Subcontract, Pile will
require the cooperation of EDC.").  Even if Pile definitively
established that it was no longer involved in any criminal
investigation and cleared up its VENDEX issues, Turner would
have no obligation to pay Pile unless or until EDC submitted the
subcontract to the Comptroller and it was accepted.  See id.
("Pile acknowledges that it will not receive any further
payments under the Subcontract until such time as the
Subcontract has been registered by the Comptroller . . . .  If,
because of Pile's status, the Subcontract cannot be registered
and approved by the City Comptroller within ten years from the
date hereof, then Pile agrees it will not receive any further
payment beyond the $13,858,830 paid to date, and waives and
releases any claims against Turner and/or EDC for such
payments.").  Indeed, the August MOU incentivizes EDC not to
submit the contract for registration because Pile would
nonetheless be obligated to complete the job for free.  Of
course, Pile's VENDEX disclosures may well have provided grounds
for the Comptroller to reject the subcontract, but EDC never

21

submitted the contract for that determination to be made.  On the other hand, the August MOU allowed EDC to unilaterally determine that the Comptroller would not register the contract without terminating Pile's obligation to complete its work and without paying Pile for that work.

Federal agreed to insure a contract for marine structures work whereby Pile would be paid on a monthly basis from a pool of ready funds.  Without informing Federal, Turner and Pile amended the subcontract such that Pile would not get paid unless or until EDC chose to submit the subcontract to the Comptroller for registration.  The August MOU fundamentally changed the nature of Pile's obligation under the subcontract from that which Federal undertook to insure in the Performance Bond. Therefore, the Court finds as a matter of law that the August MOU constituted a material modification of the Turner/Pile subcontract.

Furthermore, there is evidence that this contractual modification expanded Federal's risk in insuring the subcontract.  In August 2007, Pile had been paid approximately $13 million of a $25 million contract, with $4.6 million outstanding for completed work.  Approximately $8 million of marine structures work remained to be done at the time Pile and Turner executed the August MOU.  Thus, the August MOU required Pile to perform $8 million of work with no guarantee of payment;

this agreement made Pile's default – and Federal's liability on the Performance Bond - inevitable.

EDC contests this conclusion, arguing that Anthony Rivara of Pile testified that he had made enough money from the $13 million paid thus far to enable Pile to finish the job without further payment from Turner pending resolution of the VENDEX issues and registration of the subcontract.  Decl. of Todd A. Krichmar, Ex. A, Deposition of Anthony Rivara at 90, 113-14. This testimony is contradicted by ample evidence in the record indicating that despite promises made in the August MOU, Pile refused to continue work until Turner remitted payment.  To begin, Mr. Konon himself stated that "[w]e expected that . . . the Comptroller would reject Pile's VENDEX package and provide no further funding for Pile's work, which in turn could prompt Pile to walk off the job."  Konon Decl. ¶ 106.  Furthermore, Lovett Silverman informed Federal that Pile had done little to no work in the time immediately following the execution of the August MOU.  See Krichmar Decl., Ex. B ("Pile has not had any workers on the project and I don't know of any intentions on the part of Pile to have workers on the job this week.  All progress has come to a stop since [August 22] . . . .  Based on my interpretations of comments made by Tony [Rivara] to me, he has no intention of strongly pushing completion of the project until he gets paid."); Konon Decl. Ex. Z (informing Mr. Rivara that

"[i]t is very disconcerting to EDC that no men have been on the job site the past two days and little work . . . has occurred since the signing of the letter dated August 22, 2007"); Decl. of Robert J. Damigella ¶¶ 18-22; Ex. E.  Indeed, Pile ultimately defaulted despite the extension of time to complete work on Pier 88.  Thus, the August MOU made it more likely that Federal would be called upon to complete Pile's performance.

### 2.  Consent

Finally, EDC argues that even if the August MOU constituted a material modification of the subcontract, Federal consented to it.  "If a principal and an obligee modify a bonded contract, and the surety consents thereto, the law has no objection to any such modification, and the surety will not be discharged from its obligations under the bond."  Braspetro, 369 F.3d at 61. However, "[a] surety cannot rest supinely, close his eyes, and fail to seek important information, and then seek to avoid liability under the guaranty by claiming he was not supplied with such information."  Mohasco Indus., Inc. v. Giffen Indus., Inc., 335 F. Supp. 493, 497 (S.D.N.Y. 1971) (internal quotation marks omitted).

It is undisputed that – unlike the April MOU - Federal was not involved with the negotiations behind the August MOU and was unaware of the August MOU prior to its execution.  However, EDC contends that Lovett Silverman, the on-site construction

24

consultant, notified Federal of the August 22, 2007 MOU in an email dated August 27, 2007.  The email states, in pertinent part:  "George Pauliny [of Turner] showed me [Paul Blaetz of Lovett Silverman] very limited portions of a new MOU that Tony [Rivara] allegedly (I didn't see the signature) signed last Wednesday. . . .  George showed me the portions (less than one page) of the MOU (total 3-4 pages long) related to completion dates."  The email warns Federal that it should "[p]lease keep in mind that some of the comments are based on rumor as we have not been able to confirm status [with Tony Rivara]."  Krichmar Decl., Ex. B.  Federal argues that the first time it saw the complete, signed August MOU was on September 14, 2007 when Turner sent Federal a copy of the default letter.  Miseo Decl. ¶ 9; Ex. 3.  Federal formally noted its objection to the August MOU in a letter dated September 28, 2007 responding to Turner's demand for payment under the Performance Bond.  Miseo Decl., Ex. 6.  Thus, Federal protested the August MOU either two weeks or, at most, one month after becoming aware of its terms.

In Braspetro, the Court found that a surety consented to contract modifications where the surety was "fully informed" that the parties had agreed to make certain ongoing payments, but "simply stood by, took no action, and offered no opinion while the Obligees amended the Contracts," only objecting to the contract change in the lawsuit.  369 F.3d at 61-62.  In

contrast, here, the August 27, 2007 email, which was sent after
the MOU had been executed, at best alerted Federal that Pile may
or may not have been negotiating a change of milestone dates.
The Court notes that the extended milestone dates were not the
basis of Federal's objection to the MOU; Federal disputed the
change in payment terms, and the August 27, 2007 email gave
Federal no reason to believe that change had occurred.  In the
end, the parties' dispute about when Federal knew or should have
known about the August MOU is immaterial because in no case
could Federal have objected to the August MOU prior to its
execution.  Pile specifically requested that Federal not be
notified of the August MOU.  Konon Decl., Ex. W (editing draft
of August MOU and noting "I am not sure we want to copy bonding
company").

    Even if Federal became aware of the August MOU on August
27, 2007, there was little Federal could do at that point; Pile
had already agreed to a cessation of payment under the
subcontract.  EDC would have the Court manufacture Federal's
implied consent retroactively where there is no evidence that
Federal acted with indifference or negligence.  Instead, Federal
objected to the August MOU within a reasonable time after
becoming aware of its terms.  The mere possibility that Federal
knew of the August MOU on August 27, 2007 and waited an
additional two weeks to object does not compel the Court to find

that it closed its eyes to the potential that its liability
under the Performance Bond had significantly changed.

Therefore, the Court holds that Federal is not liable under
the Performance Bond due to the material modification of the
subcontract affected by the August MOU. The Court need not
reach Federal's alternate ground for release – wrongful
termination of the subcontract – or its objection to EDC's
standing to assert counterclaims.

### III.    Conclusion

Federal's motion for partial summary judgment [Docket No.
52] is granted. The Court's finding that Federal has no further
liability on the Performance Bond similarly resolves EDC's
motion for summary judgment on its counterclaims [Docket No.
58]; that motion is denied. Furthermore, EDC's motion to amend
its Answer is denied as moot.

The parties are directed to appear for a status conference
on April 27, 2011 at 10:30 a.m. in Courtroom 20-C.

**SO ORDERED.**

Dated:    New York, New York
          March 29, 2011

                                    John F. Keenan
                              United States District Judge

27